### ELLA JOHNSON V. THE STATE.

No. 4459.   Decided March 3, 1909.

**Theft from Person—Robbery—Charge of Court.**

Where upon trial for theft from the person the evidence taken all together did raise perhaps the issue that the money alleged to have been taken was taken under circumstances making it robbery rather than theft from the person, but also raised the issue of theft from the person by a sudden taking; and the court instructed the jury (in addition to the charge on theft from the person) that if they had a reasonable doubt whether the taking of the alleged money from the prosecutor was taken during a struggle between defendant and prosecutor to acquit the defendant, this submitted the issue of robbery as opposed to the issue of theft from the person, and there was no error. Davidson, Presiding Judge, dissenting.

Appeal from the Ditsrict Court of Anderson. Tried below before the Hon. B. H. Gardner.

Appeal from a conviction of theft from the person; penalty, seven years confinement in the penitentiary.

The opinion states the case.

*A. G. Greenwood,* for appellant.—On question of charge of court: Higgins v. State, 38 Texas Crim. Rep., 539; Mitchell v. State, 38 Texas Crim. Rep., 325; Whitcomb v. State, 30 Texas Crim. App., 269; Roquemore v. State, 50 Texas Crim. Rep., 542; 99 S. W. Rep., 547; 25 Cyc., page 64.

*F. J. McCord,* Assistant Attorney-General, for the State.—On question of court's · charge: McLean v. State, 29 Texas Crim. App., 171; Seagald v. State, 22 Texas Crim. App., 465; Flynn v. State, 42 Texas, 301; Green v. State, 28 Texas Crim. App., 493.

RAMSEY, JUDGE.—Appellant was convicted of theft from the person.

The injured party, Joe Miick, testified that he was a single man; that on the 6th of December, 1907, he was passing the house of appellant and by her invited into her house; that he went in. He says: "She waved her hand at me, and said to come in. I thought I would go in and maybe she would wash for my sister. I went up on the gallery, and then she went inside, and told me to come inside. I said that I just wanted to ask if she would do washing. She said something and went inside. She said to have a seat and I did so and she locked the door. That she came right up to me and said where was I staying? I told her on John Street, and she asked me how long I had been there, etc. She said, 'You stay with me and do some business.' I said, 'No, mam, I am not out for that right now.' She said, 'Oh yes, you got plenty of money. Give me a quarter; I want to buy some beer.' I said all right and gave her a quarter. When I was about to get up, she caught hold of me around the neck with her left arm and put me down. I saw she was working around in my pocket and I jerked loose. I saw her run in the other room with a lot of greenbacks, and she locked the door. When she came back I told her she had better give me back the money she had robbed me · f, and she came right close to me and called that name. She said, 'You son-of-a-bitch, I will kill you.' I went out through the other room and she followed me out into the yard." Then he describes his going over to a neighbor's house and calling for help, etc. He said he was 34 years of age. Further testifying, he says: "She came right close up to me and sat down right close to me. She did not put her arm around me then. If she did I did not notice it. I did not fondle her person or put my hand on her legs. I did not ask her how much she charged to do business. I did not offer her two-bits, and she did not order me out of the house. I did not know what sort of woman she was, and just gave her two-bits to satisfy her. When I got up to leave she got her arm around me and said, 'No, you stay here,' and by that time she was working around in my pocket. She got her left arm around me. The money was fastened in my left pocket with a large safety pin. Q. On which side of the sofa was she sitting? On that side of the sofa or on the other side? A. On the other side. Q. She put her right arm around your neck? A. The left arm. Q. Did she throw you over on your back? A. She held me down. Q. On the divan? A. Yes, sir. Q. She was on top of you? A. No, sir. Q. She just

had her arm around your neck, and you were forced over? A. Yes. Q. Her left arm around your neck? A. Yes, sir. Q. She kept it there all the time? A. Yes, sir. Q. She worked with your pocket with the right hand? A. Yes, sir. Q. How long did you feel her working with that pocket? A. For a minute. Q. That you could feel her working with your pocket? A. Yes, sir. Q. You could feel her working with that safety pin? A. When I saw (felt) her feeling in the pocket I jerked loose. Q. You got up and you jerked loose? A. Yes, sir. Q. Did you and she scuffle around there? Did you try to get away? A. Yes. Q. Did you have to make an effort to get loose from her and free yourself from her? A. Yes, sir. Q. Before you got loose? A. Yes, sir. Q. And all the time she had you around the neck with her left arm? A. Yes. Q. Making an effort to get the money? A. Yes, sir. Q. All that time what were you doing with your left arm? A. I said, 'You turn me loose,' and then at last I sprang up, and when I got my hand around there I stood up and it was done all in a minute. Q. Your left arm was free; it was not fastened in any way. Was it fastened in any way or was it free? A. I tried to get loose, and I pressed against the divan. Q. Wasn't your right arm free so that you could use it to hit her? A. Yes, sir. Q. You could have drawn back and hit her in the face with your fist. A. Yes, sir. Q. How much do you weigh? A. I think I weigh about 150 pounds. Q. How tall are you? A. Five and a half feet. (The witness was nearly six feet tall, and weighed probably 15 pounds more.) Q. At the time she was working after that money, did she ever release her hold from around your neck? A. Not until I jerked loose from her. Q. She held you by the neck all the time? A. Yes, sir. Q. She did not catch hold of you anywhere else? A. No, sir. Q. Did you testify on the examining trial? A. Yes, sir. Q. Your testimony was taken down? A. Yes, sir. Q. Did you testify in that trial that at the time she robbed you that she had hold of your peter? A. That was when we were sitting down. Q. Did she catch hold of you and pull you over on her? A. Yes, sir. Q. Did she have one hand around your neck and feeling of your peter? A. When she fooled around my peter she did not have her arm around my neck."

There is considerable more of this cross-examination by questions and answers, and we have selected enough to illustrate the condition of things at the time of the alleged theft. After this was all over the witness went out of the house to a neighboring house and appellant followed him. There were conversations had there in which the witness and appellant and some of the other witnesses participated. Among other things that occurred, appellant threatened to have the witness arrested for going to her house and creating a disturbance, and he said he was going after an officer himself and have her arrested. She said in that event she would

not go after an officer. Appellant was shortly afterwards arrested, charged with theft of the money, amounting to $805. The witness testifies, however, something over $200 of this money was dropped on the floor at the time appellant got it from his pocket.

Appellant's testimony is directly in contravention of this, she stating that the witness came in the house and wanted "to do business" with her and offered her a quarter, which she declined, demanding two dollars of him as the price for the transaction. The witness seemed to think this was entirely too high a price to pay. Appellant further states, in regard to the matters occurring on the divan, that they were seated together, and he unbuttoned his breeches, took out his private parts and placed her hand upon them; that this ended the matter, and he left; that she did not get his money and did not know that he had it.

This we deem a sufficient statement of the case without going into all the details of the facts.

In this state of the proof, the court gave the following instruction: "If you find from the evidence that at the time of the taking or during the attempt to take said property, if it was taken, a struggle took place between the defendant and the prosecuting witness, Joe Miick, over or about said money, then the defendant would not be guilty, or if you have a reasonable doubt on this issue you will acquit the defendant." This charge presents not only the issue of robbery as opposed to the charge of theft from the person, but was, we think, probably more favorable to defendant than it should have been. The opinions of this court from the beginning on charges of theft from the person have held quite a strict degree of proof of such particular offense necessary, and it is conceded that in this case the evidence taken altogether did raise perhaps the issue that the money, if taken from Miick, was taken under circumstances making it robbery rather than theft from the person. On the other hand, as we believe, the evidence fairly construed, does raise the issue of theft from the person. Theft from the person may be either by a taking wholly unknown to the person whose property is stolen, without his knowledge and privately, or it may be taken from his person so suddenly as to prevent effective resistance. The last condition applies in this case. The evidence raises the issue in this case that appellant, who was evidently a lewd woman, by such blandishment as her class practice, was attempting to distract the attention by appeals to the passion of the prosecuting witness, by throwing him off his guard until she could obtain possession of his money and get his pocket-book out of his pocket. The evidence raises the issue that she had been fondling with his person; that she had her arm around his neck, and the evidence distinctly shows that she had her hand in his pocket and on his money without his consent before he was aware of the fact that such purpose of theft was in her mind. Then the struggle

began, but her movements had progressed so far that effective re-sistance was out of question, and she took the money from his person, and in her haste dropped some of it on the floor. There can be no question as to the law in respect to theft from the person. The only issue that could arise is, as to the application of these rules to the facts as shown. The jury, on a charge pertinently presenting the issue and submitting on the one hand theft from the person, and on the other hand robbery, as a basis for acquittal, has found, in view of all the facts, that appellant was guilty of theft from the person. We believe that the verdict is not only supported by the evidence, but is a right and righteous verdict, and one that ought to be affirmed, which is now done.

*Affirmed.*

DAVIDSON, PRESIDING JUDGE (dissenting).—In this case I respectfully enter my dissent from the conclusion reached by my Brethren in holding that this case is one of theft from the person. The record discloses that the alleged injured party went to the house of appellant and engaged with her in somewhat lascivious conduct. While on the divan his person was exposed to and fondled by her. The State's witness, the injured party, says that she had her left arm around his neck and reached over in his right pocket and took his money, amounting to something like $800; that this money was inclosed in a pocket-book and securely fastened in his pocket by a large "safety pin." Appellant only used her right hand in getting the money, under the testimony of the prosecuting witness. He was much larger and more able bodied than was appellant. There was a struggle between them in which he resisted. This lasted a minute or longer when appellant secured the pocket-book and money. It is evident under this witness' statement that there was a struggle in which the appellant was finally successful; that with her right hand alone she was enabled to unfasten his pocket-book, as secured by the safety pin and take the money from his pocket during this struggle. It is further stated by the witness that some of the money was dropped on the floor in the room. This is from the State's side of the case. For a more detailed statement see majority opinion. Under this state of case this can not be theft from the person under our statute and the unbroken line of decisions construing that statute. The property was neither privately taken nor so suddenly as to prevent resistance. The witness testified positively that he did resist and there was a struggle. This struggle and force used places the case beyond theft from the person. In order to constitute the offense of theft from the person the legislative definition of that offense must be proved. If the evidence falls short of or goes beyond the ingredients of this offense as defined, then some other offense is shown. The question has been so often reviewed and the statement above so

often confirmed with no opposing opinions, I deem it unnecessary to discuss the question further than to cite some of the cases beginning with Flynn v. State, 42 Texas Rep., 301; Jones v. State, 22 Texas Crim. App., 680; McLin v. State, 29 Texas Crim. App., 171; Roquemore v. State, 50 Texas Crim. Rep., 542; Thomas v. State, 51 Texas Crim. Rep., 329; Herr v. State, 52 Texas Crim. Rep., 53. In the same connection see Files v. State, 36 Texas Crim. Rep., 206; Swartz v. State, 27 S. W. Rep., 136, and Gallagher v. State, 34 Texas Crim. Rep., 306. The latter case holds that where the evidence constitutes robbery, it ' is not theft from the person. All the cases hold that where there is robbery or ordinary theft, the crime of theft from the person is not only not proved, but is eliminated and disproved. There are a great many other cases that could be cited in support of my dissenting views, but I have thought those enumerated above sufficient. I, therefore, am firmly of the opinion that the evidence not only does not sustain this conviction, but absolutely disproves the case of theft from the person.

I, therefore, respectfully enter my dissent and believe the judgment should be reversed and the cause remanded.